IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

UNITED STATES OF AMERICA,

     Plaintiff,

  vs.                      CRIMINAL ACTION NO.:

SEAN McKINNON,             1:22-CR-51-3

     Defendant.

- - -

     Proceedings had in the initial appearance, arraignment, detention hearing on the superseding indictment, and motions of the above-styled action on December 16, 2022, before the Honorable Thomas S. Kleeh, Chief District Judge.

     APPEARANCES:

     On behalf of the United States of America:

     Brandon Scott Flower, Esq.
     U.S. Attorney's Office
     320 West Pike Street, Suite 300
     Clarksburg, WV 26301
     brandon.flower@usdoj.com

     Randolph J. Bernard, Esq.
     U.S. Attorney's Office
     P.O. Box 591
     Wheeling, WV 26003
     randy.bernard@usdoj.gov

     On behalf of the Defendant:

     Katy J. Cimino, Esq.
     Federal Public Defender Office
     The Huntington Bank Building
     230 W. Pike Street, Suite 360
     Clarksburg, WV 26302
     katy_cimino@fd.org

APPEARANCES CONTINUED ON NEXT PAGE

1   On behalf of the Defendant:

2       Brendan S. Leary, Esq.
        Federal Public Defender Office
3       U.S. Courthouse
        1125 Chapline Street, Room 208
4       Wheeling, WV 26003
        brendan_leary@fd.org
5
        The Defendant was present in person.
6
        Proceedings recorded by mechanical stenography.
7   Transcript produced by computer-aided transcription.

8

9                           INDEX

10  WITNESS                                      PAGE

11    CHERYL PREVOST

12       Examination by Ms. Cimino              22

13       Examination by Mr. Flower              37

14

15

16

17

18

19

20

21

22

23

24

25

1          Friday Morning Session

2          December 16, 2022, 10:05 AM

3                    - - -

4          THE COURT:  Madam Clerk, can I trouble you to call

5   our next case, please.

6          THE CLERK:  This is the matter of *United States of*

7   *America versus Sean McKinnon*; Case Number 1:22-CR-51,

8   Defendant 3.  This matter comes on for initial appearance,

9   arraignment, and detention hearing on the superseding

10  indictment and hearing on Defendant's motion for review of

11  detention order.  Counsel -- or Defendant is present in person.

12      Will counsel please note their appearance for the record.

13          MR. FLOWER:  Brandon Flower for the United States.

14          MR. BERNARD:  Randolph Bernard for the United States,

15  Your Honor.

16          MS. CIMINO:  Katy Cimino for Mr. McKinnon.

17          MR. LEARY:  Brendan Leary, Your Honor, for

18  Mr. McKinnon.

19          THE COURT:  All right.  Good morning, coun- --

20          MS. CIMINO:  Mr. McKinnon is present.

21          THE COURT:  Understood.  Thank you.

22      Good morning, counsel.  Good morning, Mr. McKinnon.

23          THE DEFENDANT:  Good morning.

24          THE COURT:  One initial question I need to ask you,

25  sir.  I know the answer.  But you can understand and

1   communicate the English language; correct, sir?

2           THE DEFENDANT: Yes, sir.

3           THE COURT: All right. With that, can I ask you to

4   please stand so that Madam Clerk can swear you in.

5     Thank you, Mr. McKinnon.

6           THE DEFENDANT: Yes, sir.

7     (Defendant sworn.)

8           THE COURT: Thank you very much, sir. You may be

9   seated. Thank you, Mr. McKinnon.

10     Obviously, sir, Madam Clerk has sworn you in. So you are

11   under oath. As I'm sure your counsel advised you -- and

12   similar to, I believe, the last time you and I saw one

13   another -- the Court will have some questions for you here

14   today. And because you're under oath, I do feel obligated to

15   remind you any false statements you may make or false answers

16   you give in response to any of those questions, those can form

17   the basis of a separate criminal action against you for false

18   swearing or for perjury.

19     Do you understand that, sir?

20           THE DEFENDANT: Yes, I do, sir.

21           THE COURT: All right. With that said, if at any

22   time you need to confer with Ms. Cimino or Mr. Leary, please

23   let one of them know or let me know. We'll take a break so the

24   two of you can talk. Do you understand that?

25           THE DEFENDANT: Yes, I do, sir.

1          THE COURT:  All right.  And that includes -- there
2  are some questions we need to run through this morning,
3  Mr. McKinnon.  If you don't understand any question I ask you
4  or you'd like to discuss with your counsel before you answer,
5  again, please let Ms. Cimino or Mr. Leary know or let me know.
6  We'll take a break so the two of you can talk.
7      Do you understand that?
8          THE DEFENDANT:  Yes, I do, sir.
9          THE COURT:  All right.  Sir, you are a citizen of the
10  United States; correct?
11          THE DEFENDANT:  Yes, I am, sir.
12          THE COURT:  All right.  Could I trouble you to tell
13  us your full name for the record.
14          THE DEFENDANT:  Sean Arthur McKinnon.
15          THE COURT:  All right.  And it's S-E-A-N; correct,
16  sir?
17          THE DEFENDANT:  Yes, sir.
18          THE COURT:  All right.  Thank you.  And what's your
19  date of birth, Mr. McKinnon?
20          THE DEFENDANT:  2/8/86.
21          THE COURT:  All right.  And your current -- where are
22  you currently residing?  Which facility are you currently being
23  held in, sir?
24          THE DEFENDANT:  C- --
25          MR. LEARY:  Your Honor, he's at NEOCC in Youngstown,

1  Ohio.

2          THE COURT:  Okay.  All right.  Understood.  Thank

3  you, sir.

4      Mr. McKinnon, a lot of this will be a repeat of a prior

5  conversation we had.  And that's necessary here because the

6  Government has secured and brought a superseding indictment

7  with different charges against you in this case than what the

8  original indictment charged you with.  Do you understand that?

9          THE DEFENDANT:  Yes, I do, sir.

10          THE COURT:  All right.  Have you been provided a copy

11  of the superseding indictment?  The actual paper of that?

12          THE DEFENDANT:  Yes, I have, sir.

13          THE COURT:  All right.

14          THE DEFENDANT:  It's right in front of me.

15          THE COURT:  All right.  Great.  Thank you.

16      And have you had a chance to read and review that before

17  today?

18          THE DEFENDANT:  Yeah.  Yes, sir, I did.

19          THE COURT:  All right.  And have you had some time at

20  least, sir, to discuss the superseding indictment and the

21  charges in it with your counsel?

22          THE DEFENDANT:  Yes, I did, sir.

23          THE COURT:  All right.  Any person, Mr. McKinnon,

24  who's been charged with a crime are brought before a judge as

25  soon as possible after arrest or after charges are brought to

1  discuss a number of very important constitutional rights you
2  have and enjoy and that this Court has to fully protect and
3  make sure are observed.

4      We're not here today to determine guilt, innocence, or
5  anything like that with respect to that charge.  We have a
6  couple things to talk about today.  But initially what we need
7  to talk about are the charges that have been brought against
8  you in particular in this superseding indictment.

9      You're represented by counsel, but we're going to talk
10 about the fact you do have the right to be represented by
11 counsel, and have counsel appointed to represent you if you
12 cannot afford to retain a lawyer of your choice, and to address
13 the issue of detention pending trial.

14     You do have that superseding indictment before you,
15 Mr. McKinnon; is that correct?

16         THE DEFENDANT:  Yes, I do, sir.

17         THE COURT:  Okay.  The superseding indictment in this
18 case was -- appears filed on December 7th, 2022.  And,
19 Mr. McKinnon, you're charged in I believe three -- or I'm
20 sorry -- two counts in that superseding indictment.  Count One,
21 sir, charges you with conspiracy to commit first degree murder.
22 And Count Five charges you with making a false statement to a
23 federal agent.

24     Count One, again, which is conspiracy -- the charge is
25 conspiracy to commit first degree murder -- allegedly violates

1   18, United States Code, Sections 7(3), 1111(a) and (b); and

2   Title 18, United States Code, Section 1117.

3      Count Five, which alleges that Mr. McKinnon made a false

4   statement to a federal agent, allegedly violates 18, United

5   States Code, Section 1001(a)(2).

6      I know -- I'm assuming I know the answer, Mr. McKinnon,

7   but you've had a chance to discuss with your counsel the

8   maximum penalties you face if you are convicted or found guilty

9   of the crimes charged in Count One and Count Five; is that

10   correct, sir?

11        THE DEFENDANT:  Yes, I have, sir.

12        THE COURT:  All right.  Count One, the maximum

13   penalty you face, sir, is life in prison.

14      And then what's the maximum penalty with respect to

15   Count -- or the false statement charge, Mr. Flower?

16        MR. FLOWER:  Five years, Your Honor.

17        THE COURT:  All right.  And the maximum time in

18   custody, Mr. McKinnon, you face with making a false statement

19   is five years in custody.  Do you understand that, sir?

20        THE DEFENDANT:  Yes, I do, sir.

21        THE COURT:  Okay.  You also, with respect to

22   Count One, face up to a $250,000 fine and five years of

23   supervised release.  Do you understand that, sir?

24        THE DEFENDANT:  Yes, I do, sir.

25        THE COURT:  Okay.  And with respect to Count Five,

1  making a false statement to a federal officer, in addition to

2  the five years of imprisonment you also face up to a

3  $250,000 fine and three years of supervised release.  Do you

4  understand that, sir?

5          THE DEFENDANT:  Yes, I do, sir.

6          THE COURT:  Okay.  Sir, there are, as I mentioned, a

7  number of very important constitutional rights that anyone

8  charged with a crime by the Government of the United States of

9  America retain, enjoy, and that this Court is charged with

10  making sure are fully observed and protected.  I do want to

11  review some of those with you at this point.

12      Ms. Cimino, do you have the form, ma'am?  The

13  constitutional rights form?

14          MS. CIMINO:  We do, Judge.  Thank you.

15          THE COURT:  Okay.  Great.

16      Mr. McKinnon, I'm going to review those constitutional

17  rights, which are most importantly discussed at this juncture

18  of this case with you.  That form should be in front of you if

19  you want to follow along.  After we review it, I am going to

20  ask you to sign and date that form.  Okay?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  All right.  But given that you've been

23  charged with two felony offenses in this case, Mr. McKinnon,

24  and here during your initial appearance with respect to that

25  superseding indictment, you do have the following

constitutional rights:  You have the constitutional right to

remain silent, sir.  If you give up your right to remain

silent, anything you say can and will be used against you in

this or any other court of law.  Even if you may have given a

statement to the police, law enforcement, or others, you have a

constitutional right to make no further statement to any

authorities or anyone else.  If you start to make a statement,

you have the constitutional right to stop in mid word or mid

sentence and say no more.

     You have a right to counsel to assist you in this matter.

If you cannot afford a lawyer, you may qualify to have an

attorney appointed to represent you.  And whether appointed or

retained, you have the right to the assistance of counsel at

every stage of these proceedings against you, Mr. McKinnon, and

during any questioning by any law enforcement officer, agent,

or authority.

     Sir, do you believe you understand all of these very

important constitutional rights we just reviewed?

          THE DEFENDANT:  Yes, I do, sir.

          THE COURT:  Do you have any questions about any of

those rights, sir?

          THE DEFENDANT:  No.  I fully understand them, sir.

          THE COURT:  All right.  And have you had a chance to

read and review the form that lists those rights that we just

reviewed?

1        THE DEFENDANT:  Yes, I did, sir.

2        THE COURT:  All right.  Ms. Cimino, if I could

3   trouble you to have Mr. McKinnon sign that for me, please,

4   and --

5        MS. CIMINO:  Certainly, Judge.

6        THE COURT:  -- date it.  It's December 16th, 2022.

7        MS. CIMINO:  May I approach, Your Honor?

8        THE COURT:  You may.  Thank you.

9        MS. CIMINO:  Thank you.

10        THE COURT:  Thank you.

11   Thank you very much, Mr. McKinnon.  That's your signature,

12   sir; is that correct?

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  All right.  Great.  Thank you.  The Court

15   will order that form filed.  Thank you.

16   Previously in this case, Mr. McKinnon, you completed a

17   document that we call a financial affidavit.  That document

18   asked you to provide the Court with information related to any

19   jobs you held, income, or assets that you owned or owned a

20   portion of.

21   And I don't know if we have a new one, Ms. Cimino, or --

22        MS. CIMINO:  Your Honor, we did file -- or fill out

23   another one just this morning, Judge.

24        THE COURT:  Okay.  Great.

25        MS. CIMINO:  May I approach with that?

1     THE COURT:  You may.  Thank you.  Thank you very

2 much.

3   And, Mr. McKinnon, your counsel has indicated that you've

4 completed another or a new, if you will, financial affidavit.

5 And is that your signature at the bottom of this form, sir?

6     THE DEFENDANT:  Yes, it is, sir.

7     THE COURT:  All right.  And it's dated December 16th,

8 today.  Did you review this document and talk to your lawyers

9 about it before you signed it?

10     THE DEFENDANT:  Yes, I did, sir.

11     THE COURT:  All right.  Is there anything in this

12 document, sir -- again, and it asks questions about employment,

13 property that you may own or partially own, or any other assets

14 that you may have.  Is there anything you believe you need to

15 update or change in this form since you filled it out earlier

16 this morning?

17     THE DEFENDANT:  No, sir.

18     THE COURT:  All right.  As far as you know,

19 everything in this form is completely accurate; correct?

20     THE DEFENDANT:  Accurate and correct.

21     THE COURT:  All right.  Thank you very much.  The

22 Court will accept and order filed Mr. McKinnon's financial

23 affidavit.

24   Given that affidavit, the Court does specifically find

25 that Mr. McKinnon qualifies for appointed counsel.  Ms. Cimino

 1  and Mr. Leary serve in that -- continue to serve in that
 2  capacity.
 3      We'll get to the issue of detention here momentarily, as
 4  we do have what I'll consider cross-motions on that issue.
 5      Mr. McKinnon, we did talk about the superseding indictment
 6  and the charges brought against you, in particular, in
 7  Counts One and Five.
 8      Ms. Cimino, would counsel and Mr. McKinnon like the Court
 9  to read the superseding indictment, or can we waive that?
10          MS. CIMINO:  Your Honor, he'll waive it.
11          THE COURT:  All right.  Understood.
12      Any objection to waiving reading, Mr. Flower?
13          MR. FLOWER:  No, Your Honor.
14          THE COURT:  All right.  We've already reviewed the
15  maximum penalties with respect to both the charges in Count One
16  and Count Five, Mr. McKinnon.  I'll ask you again:  Do you have
17  any questions about the maximum penalties you face given the
18  charges in Count One and Count Five?
19          THE DEFENDANT:  No, sir.  I understand them fully.
20          THE COURT:  All right.  Understood.
21      Any objection to waiving reading of those again,
22  Ms. Cimino?
23          MS. CIMINO:  No, Your Honor.
24          THE COURT:  All right.  Mr. Flower, any objection to
25  waiving reading the maximum penalties again?

1          MR. FLOWER:  No, Your Honor.

2          THE COURT:  All right.  Mr. McKinnon, can I ask you

3    to please stand, sir.

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Thank you.

6       With respect to the charge in Count One, Mr. McKinnon,

7    that charges you with conspiracy to commit first degree murder,

8    how do you plead, sir?  Guilty or not guilty?

9          THE DEFENDANT:  Not guilty.

10         THE COURT:  And with respect to the charge in

11   Count Five, making a false statement to a federal agent, how do

12   you plead, sir?  Guilty or not guilty?

13         THE DEFENDANT:  Not guilty, sir.

14         THE COURT:  All right.  Thank you very much.  You may

15   be seated, Mr. McKinnon.

16      The Court will note and enter pleas of not guilty on

17   Mr. McKinnon's behalf with respect to both the charges in

18   Count One and Count Five in this case.

19      Mr. Flower, has all -- at this juncture all discovery and

20   other disclosures been made by the Government in compliance

21   with the Court's previous scheduling order?

22         MR. FLOWER:  Yes, Your Honor.  And, in fact,

23   yesterday a supplemental discovery disclosure was provided to

24   not only Mr. McKinnon's counsel, but counsel for Mr. Geas and

25   Mr. DeCologero.

1        THE COURT:  All right.  Understood.  Does counsel see
2   any need to set new discovery deadlines at this point, then?
3   Mr. Flower, I'll ask you first.
4        MR. FLOWER:  No, Your Honor.  The Government will
5   continue to comply with any discovery obligations that we have.
6        THE COURT:  All right.
7        MR. FLOWER:  That's at least the Government's
8   position.  And I know we have a status hearing scheduled in
9   February for all of the defendants to discuss future scheduling
10  issues in this case as well.
11       THE COURT:  No.  Understood.
12     Ms. Cimino, any objection to -- or do we need to set a new
13  or different schedule at this point from Mr. McKinnon's
14  perspective?
15       MS. CIMINO:  No, Your Honor.
16       THE COURT:  All right.  I prematurely inquired about
17  that.  But I'll assume -- and ask you to confirm, Ms. Cimino --
18  that, of course, there's a request for pretrial discovery and
19  inspection.
20       MS. CIMINO:  That's correct, Judge.
21       THE COURT:  All right.  The Court notes that that
22  process previously began and continues.  So we'll leave the
23  current dates and schedule in place.
24     Mr. McKinnon, we've talked about this before; but out of
25  an abundance of caution, I do want to review some other rights

that you have with respect to what's required of the Government
with respect to this case.  A lot of this will sound familiar
to you because we've talked about it on prior occasions.  But I
do want to review it with you again.

Pursuant to the Due Process Protections Act of 2020, this
Court hereby reminds in open court the Government's counsel
that under *Brady v. Maryland*, 373 U.S. 83, and its progeny that
failing to disclose favorable evidence to the accused violates
due process where the evidence is material either to guilt or
punishment.  Further consequences for a *Brady* violation can
include, but are not necessarily limited to, a vacated
conviction and disciplinary actions against the prosecuting
attorneys.

The Court will enter an order confirming that it has read
this notice aloud during today's initial appearance and
arraignment.

Before we transition to the issue of detention,
Ms. Cimino, anything else we need to cover with respect to an
initial or arraignment, you believe?

MS. CIMINO:  No, Your Honor.  Thank you.

THE COURT:  Mr. Flower?

MR. FLOWER:  No, Your Honor.

THE COURT:  All right.  Then let's move to again what
I'll call the cross-motions we have.  There was a motion filed
on Mr. McKinnon's behalf -- two, technically, I guess.  There

1  was the motion to consider out of time the motion to review

2  detention order.

3       The Court will grant the motion to consider out of time,

4  Docket Number 61.  The motion to review detention order is

5  docketed at entry 62.  Government's response thereto is

6  docketed at entry 74.  The Court, of course, has reviewed all

7  of those.  And then the Government, this morning, filed its

8  motion for pretrial detention.  It's document -- it's Docket

9  Entry 86.

10      I was going to go in chronological order unless there's a

11 different suggestion.

12           MR. FLOWER:  Your Honor, I would note the Government

13 filed a motion this morning more out of an abundance of

14 caution.  I know Mr. McKinnon had been detained by order of the

15 magistrate judge in the Middle District of Florida, which then

16 creates, through the statutory scheme, this Court's ability to

17 review that order.

18           THE COURT:  Uh-huh.

19           MR. FLOWER:  However, given -- if the indictment had

20 not changed, I probably wouldn't have filed a new motion this

21 morning.  But I got to thinking about it.  The new charge in

22 Count One, the penalty is different than what it was

23 originally, which changes the eligibility for a consideration

24 for detention since it is now an offense that carries a maximum

25 of life imprisonment.  Count One is eligible for that specific

1   reason as well as, the Government would argue, crime of

2   violence.  But that's why I filed the motion this morning, more

3   out of an abundance of caution to make sure that that issue

4   would also be considered by the Court when we're looking at the

5   detention issue.

6       I'm happy to proceed however the Court wants to proceed.

7   I know initially in this case -- this is a *de novo* review by

8   the Court on the detention issue.  There's no presumption in

9   this case.  If the Court wants the Government to go first, that

10  is fine.  I think either way we go we're going to get to the

11  same end result, Your Honor.

12          THE COURT:  I -- well, I think the issues we need to

13  discuss, given the nature of the review being *de novo*, we're

14  going to talk about the same things with respect to both

15  motions.  So we'll go chronological.  My brain works better

16  that way.

17      Ms. Cimino.  Mr. Leary.

18      Yes, sir, Mr. Flower.

19          MR. FLOWER:  I wanted to add a -- I thought about

20  this earlier in the hearing.  I know the Court previously used

21  to do this when we did a lot of Zoom hearings, but giving kind

22  of a warning in regards to the recording of the proceedings by

23  anyone not present in the courtroom, Your Honor.

24          THE COURT:  Sure.

25      Let me remind folks who join us by Zoom today that the

1  Court provides that Zoom link as a convenience.  I do realize

2  we have some folks who may be witnesses or may address the

3  Court today far-flung from the Northern District of West

4  Virginia.  But it's not an unfettered convenience.  It is --

5  this Court's rules, I should say, do prohibit the recording of

6  proceedings in this courtroom, whether you're -- if you are

7  here in person or by Zoom.  That includes video, audio, or

8  still picture photography.  And anyone who violates those rules

9  of this Court can be subject to sanctions from this Court.

10       With that, Ms. Cimino, I'll pass the floor to you, ma'am,

11  with respect to the motion to review detention order.

12            MS. CIMINO:  Thank you, Judge.  If I may, I'd like to

13  call our witness, Cheryl Prevost.  She's appearing by Zoom.

14            THE COURT:  Understood.

15       Ms. Prevost, ma'am, can you see and hear us okay?  All

16  right.  Ma'am, I believe you may still have your device muted.

17  Can I ask you to unmute that?

18            MS. CIMINO:  Your Honor, we were noticing that she

19  was freezing before Your Honor came out.  She's actually at the

20  Federal Public Defender Office in Florida.  We thought that

21  might be better technologically.  But perhaps, if the Court

22  prefers, we can have her call on the line?

23            THE COURT:  No.  That's fine.  Whatever is easiest at

24  this point, recognizing bandwidth limitations.

25            MS. CIMINO:  Thank you, Judge.

1        THE COURT:  Sure.

2    We'll be at ease for a moment.

3    (Off the record, 10:25 AM to 10:28 AM.)

4        MR. LEARY:  Judge, may I address one housekeeping

5 matter while we're doing that?

6        THE COURT:  Certainly.

7        MR. LEARY:  We had attached to the motion to enlarge

8 time for the Court to consider this motion -- I inadvertently

9 attached to that motion a transcript from the detention hearing

10 that was held from the Middle District of Florida.

11        THE COURT:  Right.

12        MR. LEARY:  It should have been attached to the

13 motion for review of the detention order.  And we'd ask the

14 Court -- we'd go ahead and move for its -- and if the Court

15 is -- will permit that, we would ask the Court to consider that

16 as part of the record.  And we would move that that transcript

17 be admitted into evidence for the purposes of this hearing.

18        THE COURT:  Any objection to that, Mr. Flower?

19        MR. FLOWER:  No, Your Honor.  I just assumed the

20 Court was going to consider that transcript and any of the

21 exhibits or items that were introduced in Florida, at the

22 original detention hearing, as part of this review as well.

23        THE COURT:  No.  Understood.

24    Yeah, I've reviewed all that, Mr. Leary.  We'll make a

25 note for the record that --

1        MR. LEARY:  Thank you.

2        THE COURT:  -- it has been and will be considered as

3   part of the record here today.

4     I think we had a new phone join.  At least that's the

5   report the Court received.  Can you guys hear us?

6        MS. PREVOST:  Yes.

7        THE COURT:  Okay.  Great.  Ms. Prevost, is that you,

8   ma'am?

9        MS. PREVOST:  Yes, it is.

10       THE COURT:  Okay.  Great.  Can you hear me okay?

11       MS. PREVOST:  Yes, I can.

12       THE COURT:  All right.  Do you still have the video

13  feed, ma'am?  Can you see us?

14       MS. PREVOST:  No, I cannot.  I'm in an office just on

15  the phone.

16       THE COURT:  Oh, okay.  All right.  Understood.

17    With that, counsel, I'll ask everyone to remain as close

18  as possible to a microphone so that Ms. Prevost can hear us

19  well.

20    And I'll ask -- Ms. Prevost, the next voice you're going

21  to hear is Madam Clerk.  She's going to swear you in.

22    And I'll ask Madam Clerk to share my mic so Ms. Provost

23  can hear her.  Or no.  Go ahead, Madam Clerk.  Sorry.

24            **CHERYL PREVOST, DEFENSE WITNESS, SWORN**

25       THE COURT:  Ms. Cimino, you may proceed.

## C. Prevost - by Ms. Cimino

1          MS. CIMINO:  Thank you, Judge.

2                    E X A M I N A T I O N

3  BY MS. CIMINO:

4  Q.    Ms. Prevost, can you hear me?

5  A.    Yes, I can.

6  Q.    Okay.  Will you please state your name for the record.

7  A.    Cheryl Prevost.

8  Q.    Can you spell your last name for us?

9  A.    P-R-E-V-O-S-T.

10 Q.    And what is your relationship to the defendant,

11 Sean McKinnon?

12 A.    His mother.

13 Q.    Ms. Prevost, are you employed?

14 A.    I'm retired.

15 Q.    What are you retired from?

16 A.    The State of Vermont.

17 Q.    Can you explain a little bit about what you did for the

18 State of Vermont?

19 A.    I was a custodian II for the governor of the state of

20 Vermont and the state treasurer and retirement division.

21          THE REPORTER:  Can she please repeat that.

22 BY MS. CIMINO:

23 Q.    Could you repeat that, Ms. Prevost, please.

24 A.    I was a custodian II for the state of Vermont governor and

25 the retirement department and the state treasurer department.

## C. Prevost - by Ms. Cimino

1  Q.   So you were a custodian for the state of Vermont governor?

2  A.   Yes.

3  Q.   Okay.  And you said of retirement something?

4  A.   The retirement division and the state treasurer division.

5  Q.   Thank you.  How long did you work in that capacity?

6  A.   Thirteen years.

7  Q.   Was that any type of position of trust working in the

8  governor's office?

9  A.   Yes.  You have to be screened through the state police

10 department.

11 Q.   And, Ms. Prevost, I want to ask you a little bit more

12 about your background.  Are you a person who uses any type of

13 controlled substances, meaning drugs?

14 A.   No.  No.

15 Q.   And can you tell us how old you are?  I failed to ask you

16 that.

17 A.   Sixty-five.

18 Q.   And, Ms. Prevost, do you recall testifying at the

19 detention hearing in Florida on Sean McKinnon's behalf?

20 A.   Yes, I do.

21 Q.   And during that testimony you mentioned that you had been

22 charged previously with I believe two misdemeanors.  Is that

23 correct?

24 A.   The best of my knowledge, yes.

25 Q.   And about how long ago did that occur, were you charged

**C. Prevost - by Ms. Cimino**

1  with those misdemeanors?

2  A.   Twenty-five to thirty years ago.

3  Q.   Did you ever spend any time in jail due to them?

4  A.   No.

5  Q.   And, Ms. Prevost, let me ask you, do you have a driver's

6  license currently?  A valid one?

7  A.   Yes, I do.

8  Q.   Do you have your own vehicle?

9  A.   Yes, I do.

10  Q.   Can you tell us a little bit about it?

11  A.   A 2019 Hyundai Tucson.  And it is fully paid for.

12  Q.   Now, Ms. Prevost, I'd like to ask you some questions about

13  your home right now.  What is your address?

14  A.   1020 Northeast 30th Avenue, Apartment 120, Ocala.  And

15  it is not an apartment.

16  Q.   How long have you lived there?

17  A.   Three years.

18  Q.   How long have you lived in Florida?

19  A.   Three years.

20  Q.   Always at that same residence?

21  A.   No.

22  Q.   Were you living in another home or apartment?

23  A.   Yes, I was.  I was with my sister until we bought a house.

24  Q.   Currently, ma'am, is there anyone else living in the home

25  besides you?

## C. Prevost - by Ms. Cimino

1  A.   No, there isn't.

2  Q.   And you said it's not an apartment.  What kind of home is

3  it?

4  A.   It's a single family home.  That's the way the post office

5  put it when they put the mailboxes in.

6  Q.   You're saying they listed them as apartment numbers even

7  though it's a house.

8  A.   Yes.  Yes.  Because there's a clump of mailboxes together,

9  and that's how the post office does it in Florida I was told.

10  Q.   Do you rent that home or own it?

11  A.   I own it.

12  Q.   And as far as some of the contents in it, are there

13  firearms in the house?

14  A.   No.

15  Q.   What about any type of drugs?

16  A.   No.

17  Q.   What about alcohol?

18  A.   No.

19  Q.   How many bedrooms are there?

20  A.   Two bedrooms, two baths.

21  Q.   Now, should Mr. McKinnon be released, would he be welcome

22  to reside back in that home with you?

23  A.   Yes, he would.

24  Q.   And besides you, ma'am, does Mr. McKinnon have any other

25  family members who also reside in Florida?

1  A.   Yes, he does.

2  Q.   And who are they?

3  A.   An aunt and an uncle.

4  Q.   And where, in proximity to you, do they live?

5  A.   About five minutes' drive away.

6  Q.   Ms. Prevost, how would you describe your relationship with

7  your son, Sean McKinnon?

8  A.   It's a close relationship.  We get along fine.

9  Q.   If Mr. McKinnon were to be released, would you be willing

10 to act as a third-party custodian to him?

11 A.   Yes, I would.

12 Q.   And do you actually recall what that means, Ms. Prevost,

13 from the Florida hearing?

14 A.   Yes, I do.

15 Q.   Do you understand that you would be required to call the

16 United States Probation Office if Mr. McKinnon did not follow

17 the rules that he was placed on by release?

18 A.   Yes, I do.

19 Q.   Would you be willing to make that call?

20 A.   Yes, I would.

21 Q.   Would you be willing to make the call even though that may

22 result in Mr. McKinnon returning to jail or prison?

23 A.   Yes, I would.

24 Q.   If you saw any drug use, for example, by Mr. McKinnon,

25 would -- do you understand you would have to report something

C. Prevost - by Ms. Cimino

1    like that?

2    A.    Yes, I do.

3    Q.    Or if he had a curfew and missed the curfew, do you

4    understand you would have to report that information to the

5    probation office as well?

6    A.    Yes, I do.

7    Q.    Would you be willing to report any violation that you

8    would witness Mr. McKinnon committing if that were to occur?

9    A.    Yes, I would.

10   Q.    Is there a landline at your home?

11   A.    Not present right now.  It can be put back in.

12   Q.    I imagine you have a cell phone.  Is that correct?

13   A.    Yes, I do.  That's the only thing I have.

14   Q.    Would you be willing to have the cell phone used for

15   electronic monitoring, again, if Mr. McKinnon were to be

16   released?

17   A.    Yes.  Or I could have the landline put back in again.

18   Q.    Now, ma'am, I imagine you're aware that Mr. McKinnon has

19   had some convictions in the past of a criminal nature.  Is that

20   correct?

21   A.    Yes, I am aware.

22   Q.    Do you recall if he was living with you during the times

23   he committed those offenses?

24   A.    The best of my knowledge, he wasn't.

25   Q.    Where would he have been living then?

## C. Prevost - by Ms. Cimino

1  A.   He had a couple apartments at one time.  And he did come

2  stay with me for a little while, for three or four months,

3  until he did get his own apartment, the last apartment that he

4  had.

5  Q.   Now, Ms. Prevost, I would like to turn your attention to

6  the time period not so long ago when Mr. McKinnon was living at

7  your home.  Do you recall that time period?

8  A.   Yes, I do.

9  Q.   Do you know approximately when he started living with you

10  this past year?

11  A.   July 27th.

12  Q.   Before he began living with you, do you remember a time

13  when the probation officers or -- one or more of them came to

14  your house to inspect it, so to speak, before he was permitted

15  to live there?

16  A.   Yes, I do.

17  Q.   Did you have a problem with the probation officers coming

18  to your home at that time?

19  A.   No, I didn't.

20  Q.   Would you have a problem with it now if Mr. McKinnon was

21  released and they had to do another home inspection?

22  A.   No, I would not.

23  Q.   And to your knowledge your home was approved by the United

24  States Probation Office as a residence where Mr. McKinnon could

25  reside; is that right?

## C. Prevost - by Ms. Cimino

1   A.   Yes, it was.

2   Q.   Did you, yourself, ever have any direct contact with the

3   probation officers?

4   A.   Only when they came to my house to inspect it.

5   Q.   Did they only come out to your house the one time, then?

6   A.   Yes, that one time.

7   Q.   Would you and Mr. McKinnon spend time together when he was

8   living at your home?

9   A.   Yes, we would.

10  Q.   And can you give us some examples of what you would do

11  together?

12  A.   He would cook us supper.  We would sit out back and talk.

13  We went grocery shopping together.  We went to our community

14  pool swimming together.  We just walked around our complex

15  quite a bit.

16  Q.   And what was Mr. McKinnon's typical day like?  Can you

17  give us an example of that?

18  A.   He would get up at 4:30 in the morning, get to work by

19  5:00.  He usually worked until 3:30.  By then, he got home, got

20  a shower, because he was so tired from working.  And we would

21  just sit and watch TV.  And then about 8:00-8:30 he would get

22  ready for bed and go to bed.  And he worked overtime, too, on

23  weekends.

24  Q.   And you're mentioning his job, Ms. Prevost.  Where was

25  that at?

**C. Prevost - by Ms. Cimino**

1  A.    Fidelity Industrial Plant.  It was right up the road from
2  me.
3  Q.    Do you know what his job duties consisted of?
4  A.    There were different ones.  They were training him on
5  different jobs.  But he was learning to paint.  He was working
6  in the yard.  A few other things he was doing.
7  Q.    So he worked in different areas.  Was it a -- like a
8  manufacturing company?
9  A.    Yes, it is a manufacturing company.  Yes.  They build --
10 well, sorry.
11 Q.    Do they build generators?
12 A.    Yes, they build generators.  And he would prime the
13 generator cover for paint.  That was his main job in the
14 beginning.
15 Q.    Painting?  Is that what you said?
16 A.    Yes.
17 Q.    And you mentioned his hours.  Can you --
18 A.    Sanding and --
19 Q.    I'm sorry.  Go ahead.
20 A.    He would sand the covers down before that went on the
21 generators and stuff, that I know of, and get them ready for
22 priming and painting.
23 Q.    And his hours, did you say they began at 5:00 in the
24 morning or he left at 5:00?
25 A.    No.  He had to leave about quarter of 5:00 and worked

## C. Prevost - by Ms. Cimino

1   until 3:30 usually.  And he worked weekends.  Usually a half a

2   day.  Sometimes a full day.  Depending if the job needed to be

3   put out quicker.

4   Q.    But he worked Monday through Friday during the week?

5   A.    Monday through Thursday and then Fridays was overtime, and

6   sometimes they could go Saturdays.

7   Q.    Do you know --

8   A.    Depending on the job.

9   Q.    -- what his salary was?

10  A.    Excuse me?  I lost you.

11  Q.    Do you know what his salary was?

12  A.    I think it was $20 an hour.  I'm not positive on that.

13  Q.    To your knowledge, was he ever reprimanded at work?

14  A.    No, he was not.  And he got his bonus too.

15  Q.    What do you mean by a bonus?

16  A.    I guess after you've been there for three months and you

17  do such a good job, they give you a bonus.  And he got his

18  bonus.  And he would also -- they would go around and give out

19  cards, like, for Amazon and stuff like that.  And he did get a

20  couple of those.  But they did that with everybody.

21  Q.    So the bonus was in the form of additional compensation

22  and gift cards?

23  A.    Yes, it was.

24  Q.    How would you describe his attitude about his job?

25  A.    Willing to learn.  Wanted to learn different areas of the

### C. Prevost - by Ms. Cimino

1  company and stuff.  He was always happy-go-lucky.  The only

2  thing, he was just very tired all the time.  But he enjoyed his

3  job.  He enjoyed all the people he worked with.

4  Q.   How did Mr. McKinnon get to and from work?

5  A.   First his bicycle at the halfway house, which is two miles

6  away.  And then he got a scooter.  And once in a while, if need

7  be, I would go get him and bring him back and forth.  Because

8  he didn't have a license at the time.

9  Q.   Did he ever have to walk there?

10  A.   Yes, he did.

11  Q.   Did Mr. McKinnon's employment at this company only come to

12  an end when he was arrested in this case?

13  A.   Yes, it did.

14  Q.   Do you know if Mr. McKinnon was reporting to his probation

15  officer as he was directed to do so?

16  A.   Yes, he was.

17  Q.   And are you familiar with the circumstances of

18  Mr. McKinnon's arrest in this case?

19  A.   Yes, I am.

20  Q.   Can you explain those to us, please.  For example, where

21  was he arrested?  How did he -- how did that happen?

22  A.   He did a full day of work.  In the meantime, his probation

23  officer had called him -- this is what I was told -- had called

24  him and asked him to please come in because he had to sign some

25  paperwork that they forgot to sign.  And he went in.  And as

**C. Prevost - by Ms. Cimino**

1    soon as he went in, he saw the marshals.  So he knew what was

2    happening.

3        And in the meantime the marshals called me and told me I

4    had to come get my vehicle or it would be towed, and I had

5    ten minutes to get there if I wanted to see his arraignment.

6    And I did make it.

7    Q.   Ms. Prevost, let me ask you about if you have any

8    neighbors.  Do you?

9    A.   Yes, I do.  Yes, I do.

10   Q.   Did Mr. McKinnon --

11   A.   I have a very good neighborhood.

12   Q.   -- have the opportunity to interact with any of them?

13   A.   Yes, he did.

14   Q.   In what way?

15   A.   One neighbor needed some help moving some stuff to a

16   storage unit, and he asked Sean.  And Sean said yes, he'd be

17   glad to help him move the stuff and everything.

18       When we asked him to do stuff around our house, he got it

19   done and did it for us and stuff.  If anybody asked him, he was

20   willing to go help them after he got out of work.

21   Q.   Do you know if they -- if your neighbors that he helped or

22   interacted with were aware of this case he's been charged in?

23   A.   Yes.  I made my neighbors aware of it ahead of time -- way

24   ahead of time -- about this case.

25   Q.   Ms. Prevost, I want to ask you a little bit about

## C. Prevost - by Ms. Cimino

1  Mr. McKinnon's time at the halfway house.  Were you in contact

2  with him when he was residing there?

3  A.   Yes, I was.

4  Q.   Was he permitted to visit your home?

5  A.   Yes.  When his time was up at the halfway house for

6  probation period, I think they call it, yes, he came to our

7  house on weekends.

8  Q.   Would he stay there the entire weekend?

9  A.   Yes, he would.  And then I would bring him back.  I would

10  go get him, and I'd bring him back.

11  Q.   Was he working at Fidelity Manufacturing when he was

12  living at the halfway house, to your knowledge?

13  A.   And he was also working at a car wash first.

14  Q.   Would you have to take him to work on the weekend, or

15  would he walk or bike there?

16  A.   To the car wash?  I had to take him if he didn't take the

17  bus.  Because my brother-in-law drives bus for the City of

18  Florida.

19  Q.   Are you aware if Mr. McKinnon was being drug-tested while

20  he was at the halfway house?

21  A.   Yes.

22  Q.   Are you aware of any of the results of those tests?

23  A.   Yes, I am.  They were negative I was told.

24  Q.   To your knowledge, did Mr. McKinnon successfully complete

25  his time at the halfway house?

## C. Prevost - by Ms. Cimino

1  A.    Yes, he did.

2  Q.    Ms. Prevost, I want to ask you a little bit about if

3  Mr. McKinnon has traveled while he's been out of the BOP

4  custody.  To your knowledge, did he ever request permission to

5  travel out of the district while he was on supervised release?

6  A.    No.  Not to my knowledge.  No.

7  Q.    Did he ever travel outside of Florida to your knowledge?

8  A.    No, he did not.

9  Q.    Did Mr. McKinnon discuss with you a desire to return to

10  Vermont, for example, where he was raised; correct?

11  A.    Yes, he was raised there.

12        No, he did not mention anything about going back there.

13  Q.    Did he wish to stay in Florida as far as you know?

14  A.    Oh, yes, he did.  He enjoyed it very much.

15  Q.    Do you know if Mr. McKinnon has a passport?

16  A.    No, he does not.

17  Q.    If Mr. McKinnon were released, would you be willing to

18  travel with him to and from court in -- here in West Virginia?

19  A.    Yes.  Yes, I would.  We've discussed this.

20  Q.    Did you discuss driving or flying?  How would that work?

21  A.    Both ways.

22  Q.    Does Mr. McKinnon have a valid driver's license?

23  A.    Yes, he does.

24  Q.    Do you believe you have the funds to pay for gasoline if

25  you chose to travel by car here?

### C. Prevost - by Ms. Cimino

1  A.   Yes, I do.

2  Q.   What about if you had to stay overnight at a hotel?  Would

3  you have the ability to pay for a hotel?

4  A.   Yes, I do.

5  Q.   Do you know if Mr. McKinnon saved any of the money he made

6  while he was working that could possibly be used for traveling

7  back and forth to court?

8  A.   Yes, he does.  There's also credit cards --

9          MS. CIMINO:  Your Honor, can I have one --

10  A.   -- in my name.

11         MS. CIMINO:  Thank you, Ms. Prevost.

12  -- one moment, please.

13         THE COURT:  Sure.

14     If you'll just hold tight for one, Ms. Prevost.  Thank

15  you, ma'am.

16         THE WITNESS:  All right.  Thank you.

17         MS. CIMINO:  Your Honor, those are all the questions

18  I have.

19         THE COURT:  All right.  Thank you, Ms. Cimino.

20     Mr. Flower, Mr. Bernard, any questions of Ms. Prevost from

21  the Government?

22         MR. FLOWER:  Just a few, Your Honor.

23         THE COURT:  All right.

24     Ms. Prevost, ma'am, can you still hear us okay?

25         THE WITNESS:  Yes, I can.

## C. Prevost - by Mr. Flower

1     THE COURT:  All right.  Thank you.  The next voice

2  you're going to hear is that of Mr. Flower.  He's an Assistant

3  United States Attorney.

4     Go ahead, Mr. Flower.

5          E X A M I N A T I O N

6  BY MR. FLOWER:

7  Q.   Good morning, Ms. Prevost.

8  A.   Good morning.

9  Q.   Can you hear me okay?

10  A.   Yes, I can.

11  Q.   Okay.  Thank you.  I don't want to ask you a lot of

12  questions.  I know you were asked a lot of questions at the

13  first hearing.  But there are a few things that I did want to

14  ask you about.

15     First, you didn't mention anything about your husband.

16  Are you still married or in the process of getting divorced?

17  A.   I'm married.

18  Q.   I'm sorry.  What was that?

19  A.   I'm still married.

20  Q.   Okay.  Where is your husband currently?

21  A.   In the state of Vermont.

22  Q.   When was it that he left Florida?

23  A.   August 3rd I took him to the airport.

24  Q.   So about a week after Sean came to live with you, your

25  husband went back to Vermont?

## C. Prevost - by Mr. Flower

1    A.    A couple weeks it was, almost.

2    Q.    Okay.  Is it fair to say that there were some problems

3    between Sean and your husband that caused your husband to

4    leave?

5    A.    I didn't see any problems, but, you know -- but my husband

6    said there was.

7    Q.    Okay.  What kind of problems were they having?

8    A.    He gave his bedroom up, and I guess he didn't want to give

9    his bedroom up.  My husband didn't.  And he didn't bother to

10   express that to me.  So, instead, he decided that he wanted to

11   go back to Vermont instead of talk it out with me.  I found

12   this out after he moved that it was over the bedroom.  And my

13   son had another place to stay in our house if my husband only

14   had communicated to me.

15   Q.    Were there any other issues between your husband and Sean?

16   A.    Not that I know of.  My son tried to do everything he

17   could to please him and keep him happy and stay on his good

18   side.

19   Q.    Now, is your husband -- was this Sean's stepfather?

20   A.    Yes, it is.

21   Q.    Okay.  How long have you been married?

22   A.    Seven years.  I've known him for over 40.

23   Q.    Okay.  So you probably got married around the time Sean

24   went to federal prison back in 2015-16?

25   A.    '13.

## C. Prevost - by Mr. Flower

1  Q.   Okay.  2014.

2  A.   '13, yes.

3  Q.   Did your husband and Sean get along before he went to

4  prison?

5  A.   Yes, they did.

6  Q.   Okay.  And were they getting along when he was on -- or at

7  the halfway house?

8  A.   Yes, they were.

9  Q.   So it wasn't until Sean moved in with you that the issues

10  came up.

11  A.   Yes.  Just with the bedroom from what I was told from my

12  husband, which I do speak with him.

13  Q.   That was the only issue, just the bedroom.

14  A.   That I know of, that my husband expressed to me.

15  Q.   Did they have any arguments?

16  A.   Not that I know of.  I can't recall anything they argued

17  about.

18  Q.   Okay.  Ms. Prevost, you're probably pretty familiar with

19  your son's criminal history?

20  A.   Yes, I am.

21  Q.   From the time he turned 18 until the time he went to

22  federal prison in 2015, when he was 29, he had a lot of

23  criminal charges and criminal convictions; right?

24  A.   Yes, he did.

25  Q.   During that time period, from the time he turned 18 all

## C. Prevost - by Mr. Flower

1  the way to the time that he was 29, was he living with you at

2  all?

3  A.   At one time he was.

4  Q.   When was that?

5  A.   Twice, I think.

6       When I lived in Barre -- I don't know the dates -- he

7  lived with me for a while.  And then he lived with Paul and I

8  again just before he got arrested in Vermont for the gun

9  charges.  So he was living with us three or four months before

10 he got an apartment.

11 Q.   Okay.  So you're familiar with his convictions for

12 larceny?  For stealing things?

13 A.   Yes, I am.

14 Q.   With his conviction for assault and robbery with a weapon?

15 A.   Yes, I am.  Yes, he does tell me.

16 Q.   Okay.  Malicious destruction of property?

17 A.   Yes.

18 Q.   You're aware that he was involved in burglaries in which

19 property was stolen in Barre?

20 A.   The best of my knowledge, yes.

21 Q.   And then that he was involved in stealing firearms from

22 an -- from R&L Archery that resulted in his federal

23 conviction; correct?

24 A.   Yes, I am.

25 Q.   Ms. Cimino asked you if your neighbors knew that Sean may

1    have had some connection to the case involving Mr. Bulger.  Did
2    they know about his criminal history?
3    A.   Not that I know of, no.  I just fair warned them that we
4    were dealing with the Whitey Bulger case.
5    Q.   Okay.  So that was the extent of what you told them, that
6    he was dealing with the Whitey Bulger case?
7    A.   Yes.
8    Q.   Did you tell them anything about whether he was involved
9    in it or if he was innocent?  Did you make any statements to
10   them about that?
11   A.   No.  I just fair warned them that there's an ongoing case
12   with Whitey Bulger, and from what I've read is what I read.
13   And some of the neighbors did look it up.  So they're familiar
14   with the case.
15            MR. FLOWER:  Those all the questions I have, Your
16   Honor.  Thank you.
17            THE COURT:  Thank you.
18        Ms. Cimino, anything further --
19            MR. FLOWER:  Thank you, ma'am.
20            THE COURT:  Ms. Cimino, anything further of --
21            THE WITNESS:  Thank you.
22            THE COURT:  -- of Ms. Prevost?
23            MS. CIMINO:  No, Your Honor.
24            THE COURT:  All right.  Ms. Prevost, thank you very
25   much.

1          THE WITNESS:  Thank you very much.

2          THE COURT:  Any other witnesses, Ms. Cimino or

3    Mr. Leary, you'd like to call today?

4          MS. CIMINO:  Your Honor, we have no other witnesses

5    to call.  But Mr. Leary spoke to two other witnesses,

6    Mr. McKinnon's probation officer in Florida as well as his

7    former employer, and he'd like to make a proffer about that if

8    this is the appropriate time.

9          THE COURT:  No.  Understood.

10       And I assume, Mr. Leary, it's -- it was Mr. McKinnon's

11   supervising probation officer from what I'll call his

12   underlying conviction.  Correct?

13         MR. LEARY:  Correct, Your Honor.

14         THE COURT:  Okay.

15         MR. LEARY:  And I spoke with a Jason Maxwell, who is

16   a probation officer in the Middle District of Florida, from the

17   Ocala office.

18         THE COURT:  Thank you, sir.

19         MR. LEARY:  And, Your Honor, if I could just proffer

20   that conversation.

21         THE COURT:  Certainly.  Go right ahead.

22         MR. LEARY:  When I asked about how Mr. McKinnon did

23   on supervision, he -- his quote was -- and I quote, Your

24   Honor -- "Very well."  He said there was no issues; he was only

25   on supervision for approximately month; he had a good job and

1  was working.

2      Officer Maxwell himself had not been to the residence, but

3  his boss had and approved Ms. Prevost's residence as the

4  location for him to reside.  He said -- Mr. Maxwell reported

5  that he had no evidence or reports of any kind of any

6  noncompliance or drug use.  He said that he reported as

7  directed; and, indeed, the day of the arrest by the marshal

8  service, he called Mr. McKinnon -- Mr. Maxwell called

9  Mr. McKinnon and said he needed to come to the office to sign

10 some paperwork, and that he arrived on time, as directed, and

11 that he was taken into custody pursuant to the arrest warrant

12 without incident there at the probation office in Ocala.

13     He said he did have some reports from the stepfather about

14 some disputes with Mr. McKinnon.  But his quote to me was, "My

15 assessment was that it was a he said/she said type of thing."

16 And he said that it's not the first time in his experience as a

17 probation officer where a family member would attempt to get

18 somebody in trouble by calling the probation office.  He wasn't

19 saying that's what was occurring, but he said he had no

20 evidence that any of these allegations were in any way

21 verified.

22     And the only other thing he offered, Your Honor, was he

23 indicated that -- I have his cell phone.  I spoke to him on a

24 cell phone.  And if the Court was indeed interested in

25 inquiring of him, he would be more than happy to answer any

1   questions that the Court might have.

2          THE COURT:  Was there anything else you gleaned from

3   that conversation, Mr. Leary, other than what you've covered

4   here today with the proffer?

5          MR. LEARY:  That was the extent of my conversation,

6   Your Honor.  He -- I called him a couple of times, left a voice

7   mail.  When he returned my call, he apologized and indicated he

8   had been out of the office for a few days.  And it was a

9   very -- very normal, kind, respectful conversation with the

10  probation officer.

11         THE COURT:  Okay.  Understood.  And then you also

12  spoke with --

13         MR. LEARY:  I spoke with his employer, Your Honor.

14         THE COURT:  Okay.

15         MR. LEARY:  I spoke with --

16         THE COURT:  And who is that?  And what's the name of

17  the company or the outfit again?  I'm sorry.

18         MR. LEARY:  Certainly.  Your Honor, I spoke with

19  Erica Castleberry.  She's the HR generalist for Fidelity

20  Manufacturing.  They're located in Ocala, Florida.  And I have

21  her phone number.  And she -- I had a very delightful

22  conversation with her.  She was very respectful and, in fact,

23  had a lot of information about Mr. McKinnon's employment.

24  Because she indicated that she was the individual in the HR

25  department who actually hired him and conducted the

1    orientation.

2         And she said that he was there from April 4th to

3    August 18th.  He came in initially as a referral from the

4    halfway house.  She indicated they do have employees from the

5    halfway house, and they work with the halfway house.  They're

6    happy to hire those folks.

7         She said that he was well liked, he did a good job, and

8    that his supervisor, a gentleman by the name of

9    Terrell Denmark, had indicated to her that he was very happy

10   with his work.  She had never heard anything negative about

11   him.  She said that every time she had interacted with

12   Mr. McKinnon he was respectful; he was appropriate with all the

13   employees.  And she said the only reason that she knew about

14   his past is because she was in HR and had worked with the

15   halfway house.  She said other employees never would have known

16   anything about his background because he was a good worker.

17        She said that he showed up on time; that when he was at

18   the halfway house initially, the halfway house required every

19   day, when he arrived at work, for him to check in with the

20   halfway house, advising them that he had arrived to work.  And

21   then upon the evening, when he was leaving the facility to go

22   back to the halfway house, he was further required to notify

23   them before he left; and that she thought -- her indica- -- her

24   information was that he had did that -- had done that every

25   time.

1    She indicated that she looked at his employment record and
2 attendance record while we were on the phone, and she indicated
3 he had never missed a day of work unless -- she said he may
4 have missed once or twice if he had to report to probation.
5 She said he worked four tens and that he did work on Fridays
6 and Saturdays and that his record indicated that he was working
7 overtime about every week.

8    So, Your Honor, that's the substance of my conversation
9 with Ms. Castleberry.  And, likewise, she provided a landline
10 number that I called, the main number.  And I think I hit the
11 extension for a human resources, and she picked up.  And we had
12 a very -- as I indicated, Your Honor, a very good conversation.
13 And I have her phone number as well.

14          THE COURT:  Okay.

15          MR. LEARY:  And that would be the substance of our
16 proffer.  Thank you.

17          THE COURT:  No.  Understood.  Thank you, Mr. Leary.

18    Anything with respect to the proffer of the two
19 conversations, Mr. Flower, at this point?  I'm not going to
20 give you the chance to cross-examine Mr. Leary, but...

21          MR. FLOWER:  No.  No.  I have no objection to them
22 providing proffers.

23          THE COURT:  Okay.

24          MR. FLOWER:  Again, they've agreed for the Government
25 to proceed by proffer.

1    The only thing I would note is I never spoke with

2 Ms. Castleberry. I did speak with the probation officer

3 leading up to and at the time of Mr. McKinnon's arrest. And

4 most of that information I'm not going to disagree with. I,

5 you know, don't know what the facts and circumstances were

6 necessarily between Mr. McKinnon and his stepfather and those

7 kinds of things. But I do know that Mr. Maxwell indicated he

8 had not, himself, up to that point, had any issues with

9 Mr. McKinnon. But he had only had him for a month.

10    THE COURT: Okay. Understood. Thank you.

11    Ms. Cimino, Mr. Leary, anything further on the detention

12 issue in terms of evidence: proffer, witnesses, or otherwise?

13    MS. CIMINO: No, Your Honor.

14    THE COURT: Okay. I'll give everybody a chance to

15 argue the cross-motions, as I keep calling them, momentarily.

16    Mr. Flower, you had mentioned a proffer that you had

17 discussed with Ms. Cimino; correct?

18    MR. FLOWER: Yes, Your Honor.

19    THE COURT: Okay.

20    MR. FLOWER: I know at the detention hearing in

21 Florida the Government presented at least a proffer at that

22 point, as well as a couple of exhibits. And the Court has

23 obviously had an opportunity to consider those.

24    THE COURT: Right.

25    MR. FLOWER: I would like to make an additional

1 proffer in terms of some of the facts.

2       THE COURT:  Well -- and because one of the questions

3 I had, just given the procedural changes we've seen since the

4 case's inception --

5     Just kind of walking through it, Mr. McKinnon, so you sort

6 of understand.  I know that your lawyers have talked to you

7 about this.  But, you know, the case was indicted while you

8 were on supervised release in Florida, sir, and then you were

9 taken into custody based on the indictment in this case.  The

10 detention hearing and initial appearances and the rest were

11 held down in Florida.  Then there was the motion to review

12 detention filed here, which I believe was filed before the

13 superseding indictment.

14     Is that correct, Mr. Flower?

15       MR. FLOWER:  That is correct, Your Honor.

16       THE COURT:  Okay.

17       MR. FLOWER:  Because some of the information -- well,

18 not necessarily.  Some of the information I was able to put

19 into my response but had not been obtained before the original

20 indictment, yes.

21       THE COURT:  Okay.

22       MR. FLOWER:  That is correct, Your Honor.  Yes.

23       THE COURT:  All right.  So then the superseding

24 indictment comes.  And then, of course, this morning we got the

25 Government's motion for detention based on the charges in the

1  superseding indictment. And as we discussed earlier, the

2  superseding indictment, the crimes charged with respect to

3  Mr. McKinnon and the sentence exposure that he faces has

4  changed significantly from the original.

5        MR. FLOWER: Yes.

6        THE COURT: But with all that said, the Court, of

7  course, has reviewed everything that's been filed so far,

8  wherever it was attached ultimately. Because the Court did

9  have the benefit of the record from the Middle District of

10 Florida when the magistrate judge took up the question of

11 detention down there.

12       So the Court, of course, is aware of the nature and

13 circumstances of the offense and that, in particular, the crime

14 charged in Count One is at least arguably considered a crime of

15 violence under 3142(g)(1).

16       What I -- I guess, Mr. Flower, with all this lead-in, my

17 question is: With respect to factor two, weight of the

18 evidence, in particular, with respect to Mr. McKinnon's

19 involvement to the crimes charged in Counts One and -- is it

20 Four or Five?

21       MR. FLOWER: Five, Your Honor.

22       THE COURT: Five. One and Five.

23 -- is something we need to discuss at this point. So with

24 that, I'll pass back to you.

25       MR. FLOWER: And I anticipated that. And that's why

1  I wanted to, mainly through the proffer, address it.  I know in
2  the defendant's motion they argued that the weight of the
3  evidence is not very strong; that the Government is just
4  relying on inmate witnesses that have provided information.
5  Well, that's partially true.  We are relying upon information
6  provided by witnesses who were inmates, who obtained firsthand
7  information/statements from the defendant.  But those
8  statements are corroborated by evidence throughout this case.

9     First off I would note that video, while -- is available
10 of what happened in the F1 unit at USP Hazelton on
11 October 30th of 2018.  Obviously it's not available for what
12 happened in the actual cell where Mr. Bulger was murdered.  But
13 what we do have is video that shows the morning of that
14 incident.

15    And if I could just back up briefly too.  Mr. Bulger had
16 only been in USP Hazelton roughly ten hours before he was
17 murdered.  He was brought in that night by a transport.  By the
18 time he got to his housing unit, it was already locked down;
19 the inmates were already in their cells.  He was wheeled in on
20 a wheelchair because he was an 89-year-old man with a lot of
21 health issues.  Physically weak, small, not a big man.  Was
22 brought in and placed in a handicap cell in full view of all
23 the other inmates in the housing unit, which, we know from the
24 investigation, many of whom already knew that he was coming,
25 including Mr. McKinnon and his codefendants.

1     After Mr. Bulger was placed in that cell and locked in

2    that cell, he remained in that cell until his body was

3    discovered the next morning, around 8:00-8:30 in the morning.

4    What happened in the meantime was captured by the video in the

5    housing unit.

6     Shortly before 6:00 AM that morning, correctional officers

7    released all of the inmates from their cells in that unit.

8    They have to unlock each door one at a time as they're going

9    down the ranges.  But when they did that, they released

10   Mr. DeCologero, who was in a cell on the second tier.  He came

11   downstairs and went to the cell occupied by Mr. McKinnon and

12   Mr. Geas, who were cellmates.  The three of them were in that

13   cell.  And then the video shows these different -- these three

14   individuals coming and going from the cell multiple times.  But

15   on multiple -- at least two or three times prior to the

16   incident with Mr. Bulger, the three of them are in this cell

17   together.

18    Then a little after 6:00 in the morning, Mr. Geas and

19   Mr. DeCologero leave the cell and walk down to Mr. Bulger's

20   cell.  Mr. DeCologero opens the door.  They go in, where they

21   remain for about seven minutes.  No one else --

22        THE COURT:  And that's based on the time stamps of

23   the video?  The surveillance video?

24        MR. FLOWER:  Correct, Your Honor.

25        THE COURT:  All right.

1    MR. FLOWER:  The only other person that was around

2  that cell was Mr. Bulger's cellmate, who left the cell and,

3  prior to Mr. Geas and Mr. DeCologero, did not go back in the

4  cell.

5    During the time that Mr. Geas and Mr. DeCologero were in

6  the cell, after they left Mr. McKinnon and Mr. Geas' cell and

7  went to Mr. Bulger's cell, Mr. McKinnon came out of the cell,

8  his cell, and went over and set up, posted up by a set of

9  tables in view of the cell where Mr. Bulger was, where Mr. Geas

10  and Mr. DeCologero had went, and, for the most part, during

11  that seven-minute period remained there.  At one point he did

12  walk back to his cell and then came back in view of that cell.

13    After Mr. Geas and Mr. DeCologero leave the cell, they go

14  back to Mr. McKinnon and Mr. Geas' cell.  Mr. McKinnon also

15  goes back to the cell.  Now, they --

16    THE COURT:  And that is Mr. McKinnon's cell.

17    MR. FLOWER:  And that's Mr. McKinnon's cell.

18    THE COURT:  All right.

19    MR. FLOWER:  And, again, this is all on video.

20  There's no audio on the video in the unit.

21    And during this period of time no one else went in

22  Mr. Bulger's cell except for his cellmate, who briefly went to

23  the door, opened it, and left; and then, shortly thereafter,

24  came back, walked in briefly, grabbed his personal property,

25  and then left the cell.

1    No one else went in until the correctional officers

2  discovered Mr. Bulger's body a little while later, a body that

3  was found laying on the bottom bunk of his cell with the

4  blankets -- covers pulled up almost completely over his head,

5  covering his body.  Officers didn't get any response when they

6  tried to get his attention.  And when they went in, they saw

7  blood, pulled the blankets back, and saw his beaten face.

8    At that point the medical emergency was called; the unit

9  was placed on lockdown; the prison was placed on lockdown.  And

10  after SIS was able to review the video, they identified who

11  went into the cell.  And they went and they got Mr. Geas and

12  Mr. DeCologero and Mr. McKinnon and took them to a special

13  housing unit.

14    Now, on that day, Mr. McKinnon was interviewed by a couple

15  of FBI agents.  And during that interview he denied knowing

16  anything at all about what had happened to Mr. Bulger.  Denied

17  having any involvement.  Claimed that Mr. Geas acted normal,

18  nothing strange, nothing out of the ordinary; they never even

19  talked about what had happened with Mr. Bulger, what might have

20  happened.  Just claimed he didn't have any information

21  whatsoever.

22    The course of the investigation showed that Mr. Bulger was

23  killed by blunt force trauma to his head.  The autopsy revealed

24  multiple injuries from the superficial skin all the way down

25  deep into his brain as a result of multiple strikes to his head

1  area: his face, his head.  He had hemorrhages throughout his
2  brain that resulted in his death.  He also had other injuries
3  to his eyes.  He had lacerations and puncture wounds consistent
4  with sharp force items as well as blunt force trauma to his
5  head as well as to other parts of his body.  The medical
6  examiner determined the cause of death was a homicide by the
7  blows -- the blunt force trauma to his head.  The potential
8  that it could have been done with an object, it could have been
9  done with fists, that kind of thing.

10        In the course of the investigation, the FBI, as well as
11  the prison, became aware in 2021 that Mr. McKinnon had made
12  some statements, along with Mr. DeCologero, to another inmate
13  while they were in the SHU at USP Hazelton.  This inmate
14  provided information that Mr. DeCologero and Mr. McKinnon were
15  across the hallway from him.  They had communicated.  They had
16  advised that they were the ones involved in the murder of
17  Mr. Bulger; that Mr. DeCologero and Mr. Geas were the ones that
18  actually went in the cell, and they did it; Mr. McKinnon was
19  the lookout.  They claimed to have used a lock when they
20  assaulted Mr. Bulger.  Again, that information was provided in
21  2021.  Admissions on the part of the defendant.

22        Now, what's interesting:  Just prior to Mr. Bulger's
23  arrival and death at USP Hazelton, Mr. McKinnon made a phone
24  call to his mother.  That was discussed at the first hearing.
25  A transcript of that was placed into evidence.  But in that

1  phone call he told his mom that he knew Mr. Bulger was coming.

2  They knew Mr. Bulger was coming.  A big, high-profile inmate.

3  His mother was very concerned about that given Mr. Bulger's

4  history, notoriety.  And the defendant had advised that, you

5  know, he was basically part of his crew, the group that he ran

6  with, and that he had to associate with him.

7      A couple weeks later, after the assault, Mr. McKinnon made

8  another phone call -- the next phone call -- to his mother and

9  advised her that he was in the SHU on a conspiracy

10  investigation into the homicide of Mr. Bulger and advised his

11  mom he didn't do it, but his cellmate and another guy did; that

12  he knew who did it, essentially referring to Mr. Geas and

13  Mr. DeCologero.  That was contrary to the information that he

14  had provided to the FBI agents on October 30th when they

15  interviewed him.

16      Subsequently, after his arrest in this case, down in

17  Florida, he was incarcerated at a local jail and again spoke to

18  another inmate down there, providing almost the same

19  information that was provided to the first inmate at

20  USP Hazelton well over a year before; that he was involved in

21  the murder of Mr. Bulger, in planning it; that he's not the one

22  that committed it.  He was the lookout.  That was his assigned

23  role.  Although, he wanted to do more, but he couldn't because

24  that was not what he was assigned.  He had advised that

25  Mr. Geas and Mr. DeCologero used the lock in killing Mr. Bulger

1   while he acted as the lookout, information that was consistent
2   with the first statement that was provided over a year before.

3        Interestingly, in the time that he was incarcerated,
4   Mr. McKinnon gave multiple interviews with media outlets in
5   which he claimed he was an innocent man and also claimed that
6   Mr. Geas and Mr. DeCologero were innocent, even though he had
7   told his mother to the contrary and told other inmates at
8   different facilities to the contrary.

9        This is an extremely serious charge, conspiracy to commit
10  murder.  He's looking at up to life in prison as a potential
11  penalty.  The superseding indictment changes somewhat that
12  calculation that we might be looking at in a detention scenario
13  in terms of the seriousness of the offense, as well as when
14  we're looking at the weight of the evidence.  We're talking a
15  lot of it is his own words.

16       Now, down the road there may be issues at a trial when it
17  comes to credibility and who you believe and what you may
18  believe.  But right now, for purposes of this detention hearing
19  and when we're looking at the weight of the evidence against
20  Mr. McKinnon, it's pretty strong.  There's a lot of
21  corroboration to the statements that he provided other inmates
22  as well as the information in the phone calls to his mother.
23  It's corroborated by the video, other inmates that can
24  corroborate evidence from the videos, the forensic evidence.
25       The autopsy talking about the seriousness of the injuries

1    to Mr. Bulger I think just highlight why this is a crime of

2    violence that Mr. McKinnon conspired to commit.  While he was,

3    quote/unquote, "only the lookout," we're talking about a brutal

4    murder of an individual in a United States penitentiary that he

5    was part of planning and part of executing and then made

6    statements about wishing he could have done more.  I think that

7    talks about the danger that he poses potentially to the

8    community that he was involved in such a plan and such a

9    conspiracy and that he wished he could have done more.

10          When we also look at the facts and circumstances, we also

11   look at his background.  Mr. McKinnon was at a United States

12   penitentiary for a reason.  When you look at his criminal

13   history, Your Honor, which -- and I would note even the

14   pretrial services report that's been provided today, it was

15   updated from the one that was even in Florida.

16              THE COURT:  Right.

17          And do you have that, counsel?  Ms. Cimino and Mr. Leary,

18   do you --

19              MS. CIMINO:  Yes, Your Honor.

20              THE COURT:  Okay.  All right.

21          Go ahead, Mr. Flower.

22              MR. FLOWER:  I think in that one there were some

23   charges that we didn't have dispositions for.  We do know now

24   what the dispositions of those charges in Vermont were.

25          Starting in 2018, Mr. McKinnon started with a petit

1  larceny.  A couple years later went on again to buying,

2  receiving, selling, possessing, concealing stolen property, a

3  case in which he was given probation, but that was revoked.

4  The next year, when he was 21, assault and robbery with a

5  weapon.  He was given two months to four years in prison.  I

6  would note there was a failure to appear in 2008 on that.

7  Malicious destruction of property which occurred while he was

8  incarcerated in the Vermont DOC.

9       And then a series of charges.  Another petit larceny in

10  2014.  False -- I'm sorry.  Theft of firearms.  But a bunch of

11  charges: petit larceny, burglaries, all that look associated

12  with a scheme where he was involved in multiple burglaries in

13  Barre, Vermont.  He was convicted of some of those offenses

14  but, according to the PSR, admitted to being involved in those

15  burglaries.

16       That led up to, then, around this same period of time,

17  theft of 12 firearms from a federal firearms licensee,

18  R&L Archery, in Barre, Vermont.  Which the defendant admitted

19  that he traded firearms for drugs and had been doing that for a

20  while.  That's an extremely concerning criminal history.

21       And I think I would also note, as the judge in Florida

22  noted, that one, if not some, of those offenses involved

23  obstruction to law enforcement, providing false information,

24  similar to this case in which he provided false information to

25  the FBI.

1          THE COURT:  I saw reference to that allegation with
2   respect to a call asking, I believe, an acquaintance -- or
3   social acquaintance, I should say, to remove something from the
4   apartment?
5          MR. FLOWER:  Your Honor, right off the top of my
6   head -- I would have to refer to the --
7          THE COURT:  Okay.
8          MR. FLOWER:  -- transcript for that.
9          THE COURT:  Yeah.  Give me one second.  I'll find
10  that.  Because I read that this morning.  I have that pulled up
11  here.
12         MR. FLOWER:  And I was trying to look in the
13  narratives in the pretrial services report wherein that --
14         THE COURT:  During the detention hearing in the
15  Middle District of Florida there was reference from the
16  Government's counsel without much elaboration.  One second.
17      Well, no.  I'm sorry.  I combined two conversations.  That
18  was with respect to the firearms offense.  There was a jail
19  call asking that something needs be disposed.  Let me strike my
20  question from our conversation, Mr. Flower.
21         MR. FLOWER:  Okay.
22         THE COURT:  I'm sorry.  I --
23         MR. FLOWER:  And --
24         THE COURT:  Because there's so many calls that we're
25  taking about, I conflated the two.  That was from a prior

1  offense.  I'm sorry.

2       MR. FLOWER:  Yes, Your Honor.  I believe that was in

3  reference maybe to the -- in 2008 a false statement.  That's

4  what the transcript indicates.  But I would just rely on that,

5  Your Honor.

6       But again -- and in this case, not only, you know, did he

7  provide false information to the FBI; there were, again, the

8  multiple interviews he's provided with media outlets where he's

9  claimed no involvement, proclaimed his innocence as well as

10  Mr. Geas and Mr. DeCologero's, but then conflicting statements

11  to his mother and to other inmates.

12       These are -- again, his history shows probation

13  violations.  That was it.  The PSR -- or I'm sorry.  The

14  pretrial services report in regards to the 2008 incident

15  involving the vehicle operation with license suspended, false

16  information to law enforcement, he provided false information

17  about his identity to law enforcement at that time.

18       He just has a long record of very serious offenses,

19  violent offenses, firearms offenses, obstruction, violations of

20  terms of his probation.  When we look at while he's been

21  incarcerated -- I attached to my response his disciplinary

22  record -- several violations of prison rules while he was in

23  the custody of the Bureau of Prisons.  I think the pretrial

24  services report also indicates a lot of violations when he was

25  in the custody of the Vermont DOC.  And if you look, one of his

1  prior charges, it arose while he was incarcerated, as this case
2  also arose from his incarceration at USP Hazelton.

3  It's a serious offense looking at life in prison.  I think
4  that raises concerns about risk of flight, especially that he
5  has really no connection to our district outside of being at
6  USP Hazelton at some point.  His connections to the Middle
7  District of Florida, where he would like to go back to, while
8  that's where his mother is now, prior to that he, himself, had
9  never really had any connections to that district.  He only has
10 a few family members there at this point.

11 I'm not going to disparage or any way say anything about
12 Ms. Prevost's testimony about what she's willing to do in terms
13 of being a third-party custodian for her son.  It is her son.
14 I think, obviously, she would like her son to be out, like her
15 son to be with her, and she would be willing to have him stay
16 at her house and be that third-party custodian.  But I think
17 his criminal history, his adjustments in the past, the
18 seriousness of those offenses, the seriousness of this offense,
19 the offenses that he's looking at, those all weigh against
20 release in this case that there are a set of circumstances or
21 conditions that can be placed to ensure the safety of the
22 community, the safety of others, his appearance here in the
23 district.  And for all those reasons I would ask the Court to
24 order Mr. McKinnon to be -- remain detained in the custody of
25 the marshal service.

1          THE COURT:  Thank you, Mr. Flower.

2      Ms. Cimino?  Mr. Leary?

3          MS. CIMINO:  Your Honor, can I make my final

4   argument?  Is that what we're doing?

5          THE COURT:  It feels like that's where we are, ma'am.

6          MS. CIMINO:  Okay.  I'm sorry.

7          THE COURT:  Let me ask this question:  Is there any

8   disagreement among counsel that this Court has to look at the

9   3142(g) factors?  I mean, that's what this decision has to be

10  guided by; correct, Ms. Cimino?

11         MS. CIMINO:  Yes.

12         THE COURT:  Okay.  Mr. Flower?

13         MR. FLOWER:  I agree, Your Honor.

14         THE COURT:  Okay.  With that, Ms. Cimino, proffer,

15  argument, hybrid/combo of the two, whatever at this juncture.

16         MS. CIMINO:  Thank you, Judge.

17      We are asking that you consider releasing Mr. McKinnon on

18  conditions of release.  We think the evidence shows that

19  Mr. McKinnon is not a flight risk.  He does have ties to the

20  community in Ocala, Florida.  While he does not have ties to

21  this community, that is not required.  He doesn't have to.  He

22  does have ties in Florida.  Specifically, we've heard that his

23  mother lives there.  She's been living there for three years.

24  She said she's the closest relative to him.  In fact, it seems

25  she's probably the closest individual to Mr. McKinnon, family

1  or otherwise.

2       She moved there a few years ago, and that's where

3  Mr. McKinnon decided to release to after he was finished with

4  his incarceration.  His release plan was centered around him

5  putting down roots in Ocala, Florida, and that's what he did

6  when he was a resident at the halfway house, first, and then he

7  was approved to go on and live with his mother in her home.

8       In addition, you also heard that he has other family

9  members there.  Not many.  But he does have an aunt and an

10 uncle who also live in Florida as well.  So the bulk of

11 Mr. McKinnon's family, although not many, they are located in

12 the Ocala community where Mr. McKinnon envisions returning to.

13      Another tie he has to that community is, of course, his

14 employment with Fidelity Manufacturing.  We heard that it was a

15 facility that manufactured generators, and Mr. McKinnon did

16 work there.  He did good work there it sounded like.  He earned

17 bonuses.  He worked overtime.  He walked there if he had to.

18 He rode a bicycle there if he had to.  He rode a scooter there

19 if he had to.  He took every form of transportation to get

20 there because it was that important to him.  Which I don't

21 think most people would want to do that.  They would want an

22 easier way.  So we think that shows the dedication and grit

23 Mr. McKinnon had when it came to his fondness for the job,

24 quite frankly.  And as we heard from Mr. Leary, his employer

25 and his manager gave him glowing recommendations that he could

1   return to work there if he were released.

2      We've also heard that Ms. Prevost is willing to act as a

3   third-party custodian for Mr. McKinnon.  She would -- she vowed

4   that she would report him to probation if she saw him making

5   any missteps.  She also agreed to ensure that he would

6   physically get to court; that they would drive here together or

7   fly here together and that they have the funds to do so.  Both

8   of them have valid driver's licenses such that they could share

9   driving duties for that long trip if necessary.

10      In the same vein, while there was one failure to appear, I

11   believe, in the bond report, it was remote in time, Judge.  I

12   think Mr. Flower mentioned from 2008.  So other than that, we

13   don't see Mr. McKinnon ever failing to appear for court.

14      Finally, as to flight risk, we submit that Mr. McKinnon

15   has already proven he will not flee.  He has known this day was

16   coming.  He was investigated while he was still at Hazelton and

17   other prisons after this incident occurred.  He was in the SHU

18   for years, I believe, again, because of this matter.  He was

19   interviewed by FBI agents, or at least they attempted to

20   interview him, on at least two occasions.

21      So he could see the writing on the wall.  He knew what was

22   happening.  He knew what was coming.  And what did he do?  He

23   stayed put.  He didn't flee the state.  He didn't flee the

24   country.  He's always been in Ocala, Florida, right where he's

25   supposed to have been.  He never sought permission to leave

1  Florida from his probation officer.  He never secretly left

2  Florida without the probation officer knowing.  He's always

3  been at the halfway house or he's been at his mother's house.

4      Moving on to danger and Mr. McKinnon's criminal history.

5  Of course, we can't deny what's in the bond report and what's

6  in the former presentence report.  But we would also ask the

7  Court to consider again that it -- most of it is all very

8  remote in nature.  When he was a teenager, 18/19, and into his

9  20s is when the majority of those incidences took place.

10      In addition, there doesn't seem to be any violence, again,

11  but for the exception of -- just one moment, Judge -- the

12  attempted assault and robbery with a weapon.  We don't have a

13  factual basis in either the presentence report or the bond

14  report.  We don't know exactly what happened there.  But,

15  again, that's also remote in nature too.  It's from 2017 [sic].

16  We're talking 15 years ago.  So but for that, there is no

17  violence in Mr. McKinnon's criminal history.

18      Your Honor, to address the weight of the evidence, we

19  still contend that the evidence is not strong.  Mr. McKinnon

20  was rightfully in his cell where he was supposed to be.  He has

21  no control over, first, who his cellmate is; and second, who

22  that cellmate might associate with, meaning Mr. Geas and

23  Mr. DeCologero.

24      Mr. McKinnon going from his own cell to sitting in the

25  dayroom and back and forth is something that occurs every

1   morning by many inmates.  And we contend that that's not strong
2   evidence that he conspired to do anything.

3       As for the inmate witness testimony we heard about, I
4   don't think it's a stretch of the imagination to also believe
5   that these individuals would manufacture information to try to
6   help themselves given the high publicity, the high stakes of
7   this case, in order to try to get out of prison.  And we
8   contend that they're not consistent.  We have statements where
9   one thing is said, and then we learn in these most recent
10  statements that now Mr. McKinnon is allegedly proclaiming he
11  wanted to be more involved.  That's the first that that has
12  ever come up.  So video showing his normal movements within a
13  prison where he is lawfully allowed to be -- in his cell and in
14  the dayroom -- combined with inmate witness testimony is not
15  strong evidence, Judge.

16      Again, we think the best evidence the Court has to predict
17  what Mr. McKinnon would do if released is what he's done for
18  the past eight months.  He was released from incarceration in
19  February.  He went to the halfway house after that.  And while
20  he was there, he got a job.  He successfully completed his time
21  at the halfway house.  Then he moved on to supervised release,
22  and he was successful there, albeit that was only for a month.

23      But prior to that he had been out in the community.  He
24  wasn't committing acts of violence.  He wasn't committing new
25  crimes.  He wasn't using drugs.  He was checking in with his

1    probation officer, Your Honor.  He was taking his drug tests.

2    He was reporting as directed.  He was abiding by all of the

3    rules and regulations that were placed upon him for eight

4    months.  And no small feat, unfortunately, for some of the

5    individuals that come into this courthouse, Judge.

6         And, of course, he complied up 'til the end when the

7    probation officer called him under the guise of needing him to

8    sign more papers.  Mr. McKinnon went to work that day.  When he

9    was done, as you heard from Mr. Leary's proffer, he immediately

10   went to probation and was met by the marshals.  But no

11   incident.  No fleeing or trying to get away or anything, Your

12   Honor.

13        So we submit that there are conditions that could be

14   placed on Mr. McKinnon to ensure he's not a flight risk, that

15   he stays put in Ocala, Florida, only travels to West Virginia

16   when necessary for court appearances, and doesn't pose a danger

17   to anyone in the community, Judge.  Thank you.

18             THE COURT:  Okay.  Thank you, Ms. Cimino.  Anything

19   further on the detention question on Mr. McKinnon's behalf,

20   ma'am?

21             MS. CIMINO:  No, Your Honor.

22             THE COURT:  All right.  Mr. Flower or Mr. Bernard,

23   anything further from the Government?

24             MR. FLOWER:  No, Your Honor.

25             THE COURT:  All right.  Thank you, counsel.

1    Ms. Prevost, thank you for joining us today as well.  I

2    appreciate you doing that and sharing your --

3              MS. PREVOST:  You're welcome.

4              THE COURT:  -- thoughts with us here today.

5    As the Court indicated, it did have an opportunity to read

6    and review everything that's been compiled in the record thus

7    far, including all of the hard work the folks in the Middle

8    District of Florida had undertaken initially on this question.

9    And, of course, things have changed since then in the form of

10   the superseding indictment.  So this question of a review of

11   the preexisting detention order and the question of detention

12   and those new charges is not one that this Court undertakes in

13   a vacuum.

14   But considering all the 3142(g) factors, I do have to deny

15   the motion for pretrial release and order Mr. McKinnon's

16   continued pretrial detention.  Considering those aforementioned

17   3142(g) factors, that the offense itself is significant, as it

18   was in the original indictment --

19   Although, again, the charges have changed dramatically

20   with respect to Mr. McKinnon.  And in particular, the sentence

21   exposure has changed significantly from the five years he was

22   facing on the original Count One to now the potential of a life

23   sentence on that charge.

24   -- but the nature and circumstances of the offense, the

25   Court does believe that the crimes charged in Count One,

1   although a conspiracy charge, the object of the conspiracy this
2   Court would consider a crime of violence most certainly.
3        The evidence -- although I certainly understand,
4   Ms. Cimino, it is disputed -- I think for purposes of a
5   detention question that factor -- the weight of the evidence
6   weighs in favor -- or slants, I should say, in favor of the
7   Government as well, mindful of the no-doubt certain credibility
8   challenges of some of the witnesses the Government appears to
9   be relying upon not only in bringing these charges but in
10  prosecuting overall.
11       There are the recorded phone calls involving Mr. McKinnon
12  himself with respect to the alleged first degree murder itself;
13  but, also, those recorded phone calls no doubt frame the
14  charges in Count Five with respect to making a false statement.
15  On both those counts the Court would find that the evidence
16  there is certainly strong enough to weigh in favor of continued
17  detention here.
18       The Court has considered significantly the history and
19  circumstances Mr. McKinnon presents here with, which is
20  factor C, I believe.  And that is less of a -- an obvious
21  decision, mainly given the eight-month time frame, Ms. Cimino,
22  that I think you wisely highlight since Mr. McKinnon's release.
23       And, sir, I'll say this.  The charges in this case, as
24  Ms. Cimino mentioned, were certainly no secret.  You were
25  placed in special housing for the remainder of your time in

1   custody.  You completed your sentence on underlying, were
2   released.

3       And I think you said it was February of this year,
4   Ms. Cimino, that Mr. McKinnon was released to the halfway
5   house?

6           MS. CIMINO:  Yes, Your Honor.

7           THE COURT:  And by all accounts -- Mr. Leary detailed
8   that based on his discussions with your supervising probation
9   officer in the Middle District of Florida -- doing well and
10  doing everything we would expect folks on supervised release in
11  federal court doing:  Work, reliable there, doing a good job.
12  Reporting when you're supposed to.  Clean drug tests and the
13  rest.

14      And then you find yourself, a handful of months later,
15  back in custody with these charges.  I won't use the word
16  unfair.  It's an unfortunate sequence and chronology of events
17  for you.

18      But the Court also has to consider the entirety of
19  Mr. McKinnon's personal history and characteristics.  That
20  includes his criminal record.  There are instances, albeit some
21  dated -- somewhat dated at this juncture, of failure to appear
22  in connection with other cases.  Certainly not his underlying
23  conviction in federal court that resulted in being in custody
24  out at FCI Hazelton or in this case.  But there's also the
25  specifics of that criminal history as well.  There are crimes

1   of violence involved in there as well.

2       But considering all of the factors, this Court is left to

3   conclude that Mr. McKinnon should be detained on both bases

4   contemplated under 3142: the aspect of danger, the offense

5   involved here, Mr. McKinnon's history; in particular, his

6   criminal history.  And that would include not only the prior

7   crimes of violence -- the robbery; of course, the conspiracy to

8   commit first degree murder charge in this case -- but there's

9   also the underlying details of that criminal history,

10  including, I'll say, alleged or reported efforts to obstruct

11  justice with respect to some of those charges.  And, likewise,

12  the criminal history includes firearms offenses as well.

13      So considering the record before the Court, the Court does

14  believe there's sufficient evidence.  The Government has

15  satisfied its burden showing that Mr. McKinnon poses a

16  potential danger.

17      With respect to flight, I do believe that is a closer

18  call.  But the Court would also find the potential for a flight

19  risk and that the Government has satisfied its burden here for

20  a lot of the same reasons we've discussed.

21      I say it's a closer call, again, Ms. Cimino, that

22  eight-month period you reference.

23      But the superseding indictment, I think, changes the

24  equation significantly.  At least I believe it does.  In

25  particular, the nature of the charges in Count One of the

1   superseding indictment and the sentence exposure faced by

2   Mr. McKinnon in light of those new charges in Count One.  And

3   we'll enter an order detailing all of those reasons.

4       But for those reasons the Court will -- granted the motion

5   to review detention, but I'm going to deny the request that

6   Mr. McKinnon be released pretrial and grant the Government's

7   motion to detain Mr. McKinnon on the charges in the superseding

8   indictment awaiting trial.

9       With that, Ms. Cimino, anything further we need to take up

10  today on Mr. McKinnon's behalf?

11          MS. CIMINO:  No, Your Honor.  Thank you.

12          THE COURT:  All right.  Mr. Flower and Mr. Bernard,

13  anything further from the Government?

14          MR. FLOWER:  No, Your Honor.  Thank you.

15          THE COURT:  All right.  Thank you, counsel.

16       With that, Mr. McKinnon, you'll be remanded to custody.

17  We otherwise stand adjourned.  Thank you all very much.

18       (Proceedings concluded at 11:47 AM.)

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3      I, Rachel Kocher, a Registered Professional Reporter, do

 4  hereby certify that the foregoing is a true and correct

 5  transcript of the proceedings had in the above-styled action on

 6  December 16, 2022, as reported by me stenographically, all to

 7  the best of my skill and ability.

 8      I certify that the transcript fees and format comply with

 9  those prescribed by the Court and the Judicial Conference of

10  the United States.

11      Given under my hand this 11th day of January 2023.

12

13

14                        _____
                          Rachel Kocher, RPR

15

16

17

18

19

20

21

22

23

24

25
```

*Rachel Kocher*